Administrator, U.S. Environmental Protection Agency et al. Mr. DeMarco for Petitioner NRDC, Mr. Tallent for the State Petitioner, Mr. Carlisle for the Respondent, and Mr. Bradley for the Intervenor. Good morning, your honors. Good morning. Peter DeMarco for Petitioner Natural Resources Defense Council. With me at council table is Melissa Lynch. I'll be sharing argument time with Joshua Tallent for State Petitioners. I'd like to reserve the opportunity to introduce the State Petitioner. Two minutes of my time for rebuttal. May it please the court, I'll address two issues. First, the EPA guidance issued in this case was issued without noticing comment, even though it's a legislative rule. Second, that guidance is arbitrary because the agency failed to consider harms to health and the environment from additional HFC emissions authorized by the guidance. In Mexican Fluor v. EPA, this court partially vacated the HFC listings in EPA's 2015 rule. It vacated those listings only to the extent that they required HFCs to be substituted with safer substances. The court, however, upheld as reasonable EPA's decision to add HFCs to its list of prohibited substitutes for ozone-depleting substances. The effect of that was to leave the rule in place, leave the listings in place with respect to their valid applications, barring current users of ozone-depleting substances from switching to HFCs. Mexichem identified two categories of users, current users of ozone-depleting substances who were still subject to the HFC listings and those who had already replaced with HFCs who were beyond EPA's regulatory reach. EPA's guidance, however, indefinitely suspended those restrictions with respect to both categories. In effect, it converted Mexichem's partial vacator into a whole vacator, into a full vacator. But EPA couldn't suspend valid portions of the 2015 rule without going through notice and comment. What about the agency's argument that it's not, the guidance isn't final agency action? The guidance has immediate legal consequences. It creates rights for current users of ozone-depleting substances to switch to HFCs. That was a previously unlawful conduct that the guidance allows. So what if the, so one of the points that the agency makes in its guidance is that there's some confusion that's left as a consequence of Mexichem. So put aside the part about the big divide between whether the user has already switched to an HFC. But one of the other points they make is, look, there's situations in which, for example, a user will have multiple substances in its use. So it could have some things that are already switched to HFCs and some things that are not, where there's still an ozone-depleting substance. So if all we had was Mexichem, and then the agency says, Mexichem leaves an ambiguity about what to do in that kind of complicated situation where a user's applying more than one substance. And here's the way that we're going to do that in the interim while we issue a rulemaking. Would you think that that is final agency action that has to go through notice and comment itself? Or is that the kind of ambiguity that the agency gets to deal with in the interim without having it subject to immediate judicial review as final agency action? In this case, Your Honor, the agency could have left the HFC listings in effect with respect to their clear applications, current users of ozone-depleting substances, and issued, as I believe Your Honor is suggesting, an interpretive rule or some sort of policy statement with respect to these gray areas at the margins of the two categories identified by Mexichem. Yes, so that was an option at the agency's disposal. And that would not be final agency action? That would be an interpretive rule. So it would have to go through notice and comment. However, it might be subject to judicial review, for instance, on arbitrary conditions. Yeah. Okay. Mr. DeMarco, what about the language of the 2018 guidance itself? You know, under our precedence, that's often relevant in determining whether something is final agency action. And the guidance here talks about the fact that it's in the near term, that it's the agency's interpretation pending another rulemaking. What do you make of the language of the guidance itself? So the fact that the agency indicates that this is a temporary suspension until the agency completes rulemaking doesn't defeat the finality of the action. This court's precedent has said, for instance, in Appalachian Power, that the fact that an agency might subsequently revise its decision doesn't defeat finality. With respect to the fact that the agency is continuing to consider that policy doesn't defeat finality. Here it's not just that they're continuing to consider it. I mean, they've issued a series of questions, almost similar to something like an ANPRM, teeing up a future proposed rulemaking. And many of the questions that are raised would directly undermine the temporary position they've taken in the guidance. Doesn't that suggest that the guidance is tentative or interlocutory? Well, the guidance has immediate legal effects. I mean, the whole purpose of the guidance is to tell regulated entities that these HFC listings no longer apply and that they're free to change their conduct and engage in behavior that was previously unlawful. The agency did engage in a workshop with stakeholders about a year ago. But we still don't have a proposed rule. So, again, the fact that the agency continues to consider this and the fact that it might take a position that's contrary with it in the future doesn't change the fact that it has binding legal consequences today. And when you're talking about the binding legal consequences, the binding legal consequence that you see as foremost is the consequence that attends a user who is still using an ozone-depleting substance. That's correct, Your Honor. Particularly in the commercial refrigeration sector, there are hundreds of thousands of commercial refrigerators that continue to use ozone-depleting substances and we're still subject to the HFC listings after Mexi-Chem. What's your response to the agency's argument that the 2015 regulation didn't distinguish between entities that are using HFCs and entities that are using ozone-depleting chemicals and that it's just not severable, that there's no way to sever the illegal part of this regulation from the legal part? That's a distinction that this Court made in the Mexi-Chem decision. It distinguished between current users of ozone-depleting substances and current users of HFCs. And partially vacated the rule to the extent that it applied to that second category. EPA's severability argument is attempting to arrogate to itself the authority to determine severability after this Court has already issued a decision leaving the rule in place. Severability arguments, it could have presented to the Court, for instance, through a petition for rehearing. But since it declined to do so, it was left with the rule as it stood after the Mexi-Chem decision. What if EPA had anticipated all of this ahead of time and had had a severability or inseverability, whichever way you put it, clause in the rule itself that says that, and so we just want this to be an all-or-nothing proposition. So insofar as a Court might on judicial review invalidate any application of this, our preference would be to have the entire thing invalidated. Assuming that the Court's analysis in Mexi-Chem remained the same, wouldn't have, would not have to defer to that severability clause in the agency's regulation. It would still be within the Court's authority to make its own determination about its remedy. And if the agency disagreed with that, it could ask the Court to reconsider, or it could revise through notice and comment. But do you think the Court, when a Court's reviewing a rule that has a clause like that, I'm not familiar with that dynamic, by the way. I mean, I know it happens with statutes. But if it happened with a regulation, would a Court reviewing a regulation that said something like that, then would the Court be obligated to say, look, we think the rule is invalid in certain applications. Ordinarily, we would invalidate it as applied to those particular situations and leave it standing otherwise. But the agency has told us already that actually it views this to be an all-or-nothing proposition. And so in deference to the agency's own assessment of what severability or inseverability will be, we will invalidate the rule in its entirety. Agency intent is one of the two prongs of the severability analysis. The Court would also have to examine whether the regulation could continue to function. I just note, Your Honor, that in this case, continuing to apply the rule to current users of ozone-depleting substances serves the purpose of the rule. The rule was all about reducing HFC emissions. So continuing to apply it to a subset of the previously regulated entities is completely consistent with the agency's aims. I have one other question. If the Court were to vacate the guidance, as you suggest they should do, do you believe that the EPA would then have discretion to not apply the 2015 rule until it completed its new rulemaking? The agency would not have discretion to advocate its enforcement authority under it entirely. It could issue an interpretive rule to clarify its approach, but there are clear applications of the HFC listings going forward, again, most importantly in the commercial refrigeration sector. But could they use their discretion to not apply it until their rulemaking is complete? They could use enforcement discretion in, for instance, in these gray areas that we've discussed earlier, or on a case-by-case basis. But to completely abandon enforcement of the rule, it would at least have to provide a reasoned explanation to do so, Your Honor. Unless the Court has further questions. Thank you. Good morning, Your Honors. May it please the Court, Joshua Talent, New York State Department of Law for the State Petitioners. Nationally, 30 to 40 percent of existing grocery stores and supermarkets currently use ozone-depleting substances in their refrigeration systems. But as these remaining ozone-depleting substances phase out under Title VI, these current users will be forced to replace their existing refrigeration systems with new units. And those new units will, perforce, be designed to use an acceptable substitute for ozone-depleting substances. Under the 2015 rule, as upheld by this Court, these supermarkets and grocery stores currently using ozone-depleting substances cannot lawfully switch to prohibited HFCs. But by repudiating the 2015 rule's HFC listings in their entirety, and thus allowing this distinct class of users to switch to prohibited HFCs, EPA's guidance is both a reviewable final action under Section 307B1 of the Act and a legislative rule for which notice and comment were required. EPA attempts to justify its failure to follow notice and comment procedures hereby, arguing that the guidance was but the necessary legal consequence of this Court's... That Judge Rao pointed out. It says this is just temporary. We're going to issue... In fact, they've already issued, apparently, an NPRM. This Court has held in the past that temporary agency action is not necessarily a bar to finality. The guidance, in effect, suspends compliance obligations for all current users of ozone-depleting substances. EPA is certainly free to issue, well, to engage in rulemaking in the future to address the regulations or the HFC listings in particular and their applications, especially in the sort of more difficult application areas that the agency has identified. But that doesn't undermine the finality of the guidance now, insofar as it affects the legal rights and obligations specifically of current users. Is it your position that the agency's only option was to continue enforcing the 2015 regulation as what was left of it after Mexican? It had to continue enforcing it until it issued a new notice and comment regulation? They have no interim authority. To the extent this Court partially vacated the 2015 rules... My question is based on your assumption. Your interpretation of our remand, I'm assuming your interpretation of our remand is correct. That is, that we left in place the prohibition on users of ozone-depleting chemicals switching pages. Is it your position that EPA's only option, if it didn't want to do that, was to issue a new regulation through notice and comment ruling? EPA had a number of lawful avenues to pursue in the wake of the Court's decision in Mexican. It could truly have done nothing and allowed the Court's order to stand, in which case regulatory counsel for national supermarket chain acts, for example, having read the Court's decision, probably not concluded that they were no longer subject to the rule. EPA could also, as it suggests it might have done in its papers, issue a narrow guidance saying perhaps that the Court's decision should be read not only to apply to product manufacturers, but more broadly to all regulated entities under Title VI. Or, as Mr. DeMarco suggested, it could have issued an interpretive rule, revamping its interpretation of the statutory term replace, which is what the Court struck in Mexican to better accord it with the Court's decision. It could have returned to the Court to seek clarification, could potentially have invoked its emergency rulemaking powers. It did none of those things. What it could not do is wipe away a legal obligation that remained after this Court's decision in Mexican without notice and an opportunity for public comment. If you look at the language of the guidance, it doesn't have the sense that it's unequivocal. For instance, the guidance says that it's going to consider the retroactive disapproval that was mentioned in Mexican I. It also talks about moving forward with a path of distinguishing between users who have already switched from ozone-depleting substances and those who have not. Do you think, in that situation, a regulated entity has certainty that they could switch to an HFC, given that the agency has specifically said that it is considering how to implement those aspects of Mexican I? Grant, there is some language in the guidance that is somewhat equivocal. But, fundamentally, EPA's position in the guidance, EPA isn't exercising its enforcement discretion. It's justified the guidance based on the argument that the Court's decision in Mexican compelled total abrogation of the 2015 rules, HFC listings. And that's, of course, EPA's position in this litigation. I think that a user of ozone-depleting substances, a supermarket user, for example, who read the Court's decision would not think that the user was no longer subject to the 2015 rules. But, after reading the guidance where EPA says explicitly and repeatedly that it will apply the guidance under no circumstances, that user now feels free to change its behavior as a basis. So, potentially, to a rulemaking that takes a different position? Potentially. EPA is absolutely free to engage in future rulemaking activity. It has not issued a proposed rule yet. And we are willing to concede that there are difficult cases of application that could well be and should be addressed in a future rulemaking, but that doesn't undermine the finality of the guidance. And it doesn't change the fact that it has changed the legal landscape for at least the current users of ozone-depleting substances to whom the rules should unambiguously apply. Thank you. May it please the Court. My name is Ben Carlyle from the Department of Justice on behalf of EPA. At counsel's table is Diane McConkie from EPA's Office of General Counsel. The SNAP guidance is not final agency action because it simply articulates the effect of Mexican I and therefore lacks legal consequences. It is also... Let me just read you a sentence from the NRDC brief and tell me if you think it's inaccurate. It says, before... I'm on page 22. Before EPA issued the guidance, a business that replaced ozone-depleting substance with an HFC in violation of the 2015 rule ran the risk of an agency enforcement action. The guidance eliminated that risk. Is that inaccurate? Your Honor, I think we believe that's inaccurate because we think that the legal effect of Mexican I was necessarily to vacate the 2015 rule in its entirety. As a result, those users would not, in fact, face the risk of an enforcement action. You said legal effect. Right. So you wouldn't know that reading the opinion. Your Honor, I think our conclusion when we read the opinion, when we looked at essentially the severability considerations, when we looked at essentially the lack of a regulatory scaffold or basis to draw the broad conceptual distinction in Mexican I, and it's important to remember that that conceptual distinction is not found anywhere in EPA's regulations as they stand. EPA's regulations as they stand prohibit the use of any substance designated as unacceptable by any person. But suppose Mexican I was just unambiguous. And I'm just willing to assume for present purpose that it wasn't unambiguous. But let's make it even less unambiguous. Suppose the Court just said, just to be clear, to recap our decision, our decision is that the rule is invalid insofar as a user has already switched to an HFC. The rule remains valid insofar as a user continues to use an ozone-depleting substance, and EPA can continue to enforce the rule with respect to those applications. Your Honor, I think the Court said that, that you would still have the exact same arguments that you make in the guidance, which is that, yeah, the Court said that, but, you know, actually, if you look at the rule, it doesn't draw that distinction. And we just don't think that it makes sense to draw that distinction, and so we're not going to do it. In that situation, would you say that a user should have known that that would have been what you would do, because a user should have been able to say, well, I'm going to apply severability principles, and I'm going to see that even though the opinion said X, the agency is going to conclude Y. Your Honor, I think that's a very different situation than what we have here. And I think the answer to that question is, in those circumstances, the Court presumably would have done some sort of severability analysis in determining that the rule remains in effect. And I want to – No, I'm not saying – that's not the hypo. I'm saying the opinion is exactly the same as it is, except it has a final concluding paragraph that just says, to be clear, here's what we're saying. Your Honor, I think that in that case, the Court wouldn't have done the severability analysis, and there might be a basis for EPA to come in and say, this actually is, in fact, unenforceable and seek clarification, as it has somewhat similarly done here. The fact of the matter in this case, though, ends up being that because the Court didn't say anything to that effect, that, in fact, is a very different case. I think that what we've ended up with here is a situation where the Court – I'm going to end by saying these aspects of the Court's opinion cannot be implemented in the literal sense. The word literal must be doing some work. I don't know exactly what it means to say in the literal sense, because literal to me just means what it says. But what you're basically saying is the Court said something, but those aspects of the Court's opinion, we just can't do. So, I mean, you're reading the opinion the same way that I just said that the opinion would be read if they had made the clear statement at the end. And you're still saying that even though that's the way to read the opinion, qua opinion, it just can't be done that way. And I'm not necessarily saying you're wrong in that. I'm just saying that I don't see the big difference between the hypo that I gave you and reality, because you yourself are reading the opinion to do what I suggested it would make clear that it had done. I see your Honor. I think you're correct that we would still view – we would still view the regulation as not having the necessary scaffold for EPA to pursue enforcement. And there's been discussion, for example, of EPA's enforcement discretion. That might be an avenue that EPA would employ in that circumstance where the Court has been very clear. I think in that case, that might be the rationale that EPA might give for its enforcement discretion. In this case, because the Court wasn't that clear and we think never considered the severability question, that the opinion itself can be read and should be read in terms of what that regulatory structure actually is. So if the Court had, in fact, said the rule remains in effect, there might be different avenues that EPA had to take in light of the inability to address the lack of the regulatory basis to draw these distinctions. The Court did say at 457 and 458, it follows that EPA may bar any manufacturer that still make products that contain ozone-depleting substances from replacing those ozone-depleting substances with HFCs. Of course, that aspect of the 2015 rule is not a big deal, and that's just an empirical question about how much it really matters. But the Court seems to be clearly saying that aspect of the 2015 rule, we're not touching that. What we're touching is other aspects of the 2015 rule, i.e., those aspects in which it's dealing with a user who's already switched to an HFC. Your Honor, I think that that conflates the distinction between, I guess, there's two points to be made there. The first is that we view that as a statement of EPA's authority in part, that EPA retains that amount of its authority. And the second goes to Petitioner's, I think, conflation of the Court addressing an arbitrary and capricious challenge with the idea that the Court explicitly held that some portion of the rule would remain in force. And courts often address the whole of the challenge in front of them, even if they have issued a broad vacature that's used broadly. I have an example, which is Americans for Clean Energy, in which the Court, this is 864 F. 3rd at 713, the Court held that EPA exceeded its authority in how it exercised its inadequate domestic supply waiver under the Renewable Fuel Standards Program and remanded that portion of the rule at issue, but still considered additional challenges to EPA's treatment of the same waiver and upheld EPA's approach in those respects. So I think there's a real difference between saying that the Court has looked at the whole case in front of it and found that, yes, it was rational for EPA, in light of the comparative risks of HFCs to other substances, to list them as unacceptable, and actually holding that the rule remains in force and remains enforceable. And that issue, on the whole, was simply never before the Court. Can I ask one last question along these lines? Sure. Which is, suppose the agency had seen what was coming and the agency ahead of time had a severability or inseverability clause in the rule itself and it would have said, insofar as a court might conclude that this rule is invalid in certain applications, it remains valid in all other applications. So it's the kind of severability clause that you often see in statutes that gets to the level of application rather than kind of coherent, syntactical phrases of the kind that you all talk about in your brief. So if they had said, we want to do the application one, and the agency had said, insofar as the court invalidates it as to certain applications, it remains valid as to other applications, that would have been fine? Your Honor, I think that would signify an agency intent that the rule remain enforceable in those applications, and that's certainly something under this Court's severability precedent that the Court would consider. But the Court would, in fact, have to look at the other factors and whether the rule was, in fact, implementable. And the case that I think is on point there is the MDDCDE broadcaster's case that we cited in our brief. And there, the rule itself, in fact, stated that the agency intended the regulation to be severable. The agency asked the courts to sever the invalid aspect. There was regulatory text that could be easily treated as stricken, and there was no apparent difficulty in partially implementing the regulation. And the Court still held that the invalid provision was not severable because it was valid. Right, that's my question. If the EPA had done that in this case, you would say that the proper resolution for a court would be to say, too bad. Actually, you can't. I think that looking at the regulatory structure in this case, the EPA's view is there's simply not a scaffold there that allows it to implement concretely the broad conceptual distinctions. And I think, you know, I don't want to prejudge that case because that statement doesn't exist, but I think my response is, yes, I think that it's very likely we would be saying that that's, you know, in light of the inability to implement that, that notwithstanding that statement, the rule may, in fact, not be severable, that the whole rule would have to fall in those circumstances. Well, I had maybe in part a related question. So, I mean, if you could just clarify, I mean, is EPA's view that Mexichem I effectively invalidated the entire 2015 rule? Or is it your view that given some of the, you know, ambiguity and the difficulty of implementing Mexichem I, that that is how EPA is interpreting that in the interim pending rulemaking? Your Honor, I think that, honestly, it's both to some extent. And the questions are not wholly distinguishable because I think our view is, in fact, that if you do the separability analysis that the court and all parties overlooked in Mexichem I, that what you would find is, in fact, that the whole of the rule should have followed or should have the whole rule should have fallen. And that playing into that is that when you look at these complex distinctions that actually implementing that decision would require, you find there's no basis for them. And that's why even NRDC in its past briefing said that it would require, implementing the rule would require complex distinctions among categories of users that aren't found in the statute or the regulations. But I also think that at the end of the day, this is an interim rulemaking. This is, or excuse me, this is an interim guidance in which EPA is essentially setting forth its approach. I think that would be an alternative basis. The distinction I suggest, though, does it not go in part to the finality question? It does to some extent, Your Honor, because obviously whether a rule is the consummation of the agency action and the agency's final statement of its position is one of the dynamic factors. And so it's certainly the fact that this is an interim guidance document, that this isn't the agency's final statement of its position, is something that the Court should consider and that could lead the Court to find that the rule is not final. Well, let me just try to continue this line of questioning. When I first asked you about finality, my first question, your answer was it's not final because it was Mexican I that invalidated the whole rule. Suppose I don't agree with that. Suppose I read our decision as, in effect, sort of shrinking the universe of regulated parties to those still using ozone-depleting chemicals, and that after our decision, they under the rule cannot switch to HFCs. Now, if I view it that way, isn't this rule final, the guidance final? Even though it's interim, the fact is that after, under it, a, I'll state this as a question. Isn't it true that under the guidance, a entity using an ozone-depleting chemical can switch to an HFC without the risk of an enforcement action, whereas before it, it could not? Your Honor, I think. Isn't that true? If we accept the premise of your hypothetical that you disagree with our, then yes. That's what hypotheticals are for. So accept my hypothetical and answer my question. Yes. So based on that premise, I think you would find legal consequences. I think by definition, if you disagree with our reading of Mexican I. You would concede this is a final regulation. We would concede it has. A reviewable regulation because of its legal consequences, even though it's interim, right? Your Honor, I think that's right. I think that even if the court finds that our reading is just flat-out wrong, it is very likely a reviewable agency action. Okay. If the court has no further questions, we would ask that the petitions be denied. Okay, thank you. May it please the court, Keith Bradley for the interveners. I'd ask the court to recognize the difficult spot that EPA was in after MexiChem I. This regulatory program has, from the beginning, been about sector and function, and chemicals and substances have been banned or restricted on that basis. What petitioners are asking for is essentially a user or a unit or a product or something else-based regulation. And it's not so easy to get there from where the program already was. I thought their argument was that any, correct me if I'm wrong, but I thought their argument was that any, after MexiChem, any entity, any company using an ozone-depleting chemical at any time could not switch to a matrix of any kind. I think that is their argument, Your Honor, but I think they've elided the difficulty of that as a practical matter. Just explain. Yeah. Why is that difficult? I can't explain that to you. Let me give you an example. Yeah, give us an example. So let's suppose I operate a fleet of cars, some of which have the AC systems are using HFC refrigerants, some of them are using ozone-depleting substances. I've got 50 of each kind of car. I have replaced some of the cars. Whether you say that I am a user who has replaced the ozone-depleting substances requires further work about the meaning of replace. Don't you just do it car by car? The cars that have already replaced them, they're free. The cars that haven't, they can't switch to HFCs. Why is that confusing? That's one potential answer. Why is that a confusing answer? It's not a confusing answer. Isn't it quite clear that that solves the problem? It does solve the problem, but I don't think that's the only way to solve the problem. No, but EPA's guidance says they're issuing this because there's confusion. You just gave me an example. I came up with an answer, which you said is clear. What's the confusion? I don't think that it is confusing about different ways you could answer the question. My point is that which one is a policy judgment that EPA needs to make? But doesn't that go to the point that I think the other side actually said would be fine, which is that there are going to be situations that are complicated, and in those interstices, it might be okay for the agency to come up with a regime that's going to govern for the interim period. What the agency can't do is just to say, as a blanket matter, it doesn't matter if somebody hasn't switched yet to an HFC. The rule's still invalid, and that's what the agency did. So you're still going to have these situations. I think the one that you posit is one in which it's maybe complicated to some extent to figure out what the relevant user is, and that's exactly one of the situations that the agency points out. But I think the other side said at the beginning of its argument, yeah, well, we get that, and that's the kind of zone in which maybe the agency has some room to operate. But what it can't do is the blanket measure that it undertook in the guidance. So with respect, Your Honor, the blanket measure that they took is not to say that the rule itself is invalid. It's to say that EPA will not be applying that, and I think we all agree that that means EPA will not be enforcing it. So this is really a non-enforcement guidance. But only in the sense that every time you say a rule is going to be we're going to deem invalidity to apply to the entire rule, that's always non-enforcement because the consequence of that is you can't enforce. What EPA didn't say is we have only a limited number of resources to allocate across all of our enforcement programs. What we're going to do now is, as a matter of enforcement discretion, we're going to decide that we're not going to enforce these applications of this rule. They didn't do that. Had they done that, it would be a different case. I'm not necessarily seeing how that would come out, but I think you're trying to say that this case is that one, and that seems different to me. Well, if I may respond, there are many reasons to exercise enforcement discretion. Priorities and resources is one. Right. In this case, they decided not to enforce because they wanted to go down the road of doing rulemaking instead of working it out on a case-by-case basis. Do you think an agency has that authority? To choose not to enforce? Do you think an agency can? I was going to ask you this because you answered Judge Schleenbausen's earlier question the same way. Do you think an agency that has a program, statutory program that's operating under an issued regulation, can choose to stop enforcing it because it plans to change the program in the future? Do you think it has that authority? I do think it has the authority to take a pause on enforcement, yes. We have many cases, you know, that say that's not accurate, that an agency cannot simply sustain the enforcement of a program, and that it can only do that through another notice and conduct rulemaking. Do you have a case that says that? I do not. What's your best case which says that you think an agency can do that? So I'm going to rely entirely on the Heckler v. Cheney line in which, and I would like to make a distinction if I could. Yes, sure. Between an agency's simply announcing here's a rule, we're just never going to enforce this, we don't like that law. No, no, that wasn't my question. But this case was temporary. That wasn't my question. Yes. My question was do you think an agency which wants to revise a regulation can stop enforcing it in the interim? And if so, what case supports that? I don't have a case to put in front of you right now other than the general Heckler v. Cheney line, and I would also like to – You mean prosecutorial discretion. Exactly. And I'd also like to stress, if I may, that this is a case where there is another enforcement happening. I'm not going to suggest that there are citizen suits every day, but any citizen, including the petitioners, that believes that this rule is still in effect after Mexican I can bring suits to the extent they are standing and EPA can't stop it. Okay, but that doesn't affect whether or not this guidance is final or not, does it? That's not related to that question. Correct? With respect, I think that if the – I think it does relate to that question to the extent we ask whether it is an enforcement policy or not, although there are many ways also to do that. So just to be clear, so the upshot of your argument then would be that Mexicam doesn't even matter because if the court had never issued a decision in Mexicam, let's just say Mexicam I is nonexistent, and then the agency just says, you know, we're going to reconsider what to do with the 2015 rule. And – but while we're reconsidering it, we're just not going to have that – we're going to act as if that rule is not in effect. You would say that's enforcement discretion, that's interim, that's non-final and non-reviewable, and so the rule just stops being – we're going to treat the world as if the rule doesn't exist until the time that EPA reaches the culmination of whatever process it's occasioned. I take your point – I think one difference that I would point out is if there were no Mexicam I, or if we go back to your hypothetical Mexicam I, we're very clear about what it did. After some years, if EPA continued not to enforce and continued not to enforce, perhaps there would be – an action would lie to say you are not undertaking your – But that would be off in the distance at some point. Right. Two years is not that time. You would say it's the same thing. Yeah, two years is not that time. But in late admin. Right. Okay. Thank you. Let's see. Did Mr. DeMarco have any time left? Mr. DeMarco, you have 30 seconds left. Okay. You can have two minutes. Okay. Your level of time for the NRDC and EPA. Pardon me? Your level of time for the NRC and EPA. For both of them. Okay, great. You can take two minutes, Mr. DeMarco. Thank you, Your Honor. On the issue of whether or not this was an interlocutory decision or not, I direct the Court's attention to Clean Air Council v. Pruitt, which said that the EPA stay at issue in that case was essentially an order delaying the rule's effective date, and this Court has held that such orders are tantamount to amending or revoking a rule and found that that was sufficient to establish finality there. Here, the 2015 rule established effective dates for each of the end uses covered by the HFC listings, and the EPA guidance has the effect of eliminating those effective dates or at least suspending them. And also, in terms of a time frame, we're talking about a suspension that's been in place for a year. We estimate that about 100,000 commercial refrigerators have been able to transition from ozone-depleting substances to HFCs in that period. I'd also note— I really think there's nothing in the record about that. We offer an expert declaration, Your Honor, in our standing addendum. Thank you. The Court, with respect to the meaning of the arbitrary and capricious holding in the case, the Court said exactly what it was doing. As it was transitioning from the first part of its opinion with the statutory authority holding to the second part about the arbitrary and capricious, it said, Our conclusion that the 2015 rule must be vacated, requires manufacturers to replace HFCs, does not answer the question whether EPA reasonably removed HFCs from the list of safe substitutes in the first place. This wasn't a holding in the alternative. The idea was that there was still part of the rule in place, and the Court needed to decide if EPA had acted reasonably. Finally, I'd just note, Your Honors, that we acknowledge that there were gray areas here, but the Court doesn't need to decide the full range of options that was available to EPA in the wake of Mexichem. It just needs to decide that Mexichem left part of the rule in place and EPA suspended it without notice and comment. We'd ask that the Court grant the petitions for review and vacate the guidance. Thank you, gentlemen. The case is submitted. Stand, please.
judges: Tatel, Srinivasan, Rao